UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X
                                :

ANTHONY ZAPPIN,              :
                                :

                    Plaintiff,    :      16 Civ. 8762 (KPF)
                                :

                  v.          :      OPINION AND ORDER
                                :

DAILY NEWS, L.P., d/b/a THE DAILY   :
NEWS,                              :
                                :

                  Defendant.  :
                                :
------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: August 9, 2017

KATHERINE POLK FAILLA, District Judge:

      Plaintiff Anthony Zappin[1] currently has three separate actions before this Court arising from his divorce proceedings in New York State Supreme Court: the instant lawsuit against Defendant Daily News L.P.; a similar (though not factually identical) suit against the New York Post, *see Zappin* v. *NYP Holdings, Inc., et al.*, No. 16 Civ. 8838 (KPF); and a more comprehensive lawsuit against New York State Supreme Court Justice Matthew F. Cooper, who presided over a portion of Plaintiff's divorce proceedings, *see Zappin* v. *Cooper*, No. 16 Civ. 5985 (KPF). In this case, Plaintiff alleges that an article published by Defendant about an evidentiary hearing in Plaintiff's divorce proceedings was false and defamatory; he thus asserts a single claim of defamation against Defendant in his Amended Complaint (the "FAC"). Defendant moves to dismiss

---

[1]    Plaintiff Zappin, while proceeding *pro se* in this matter, is in fact an attorney. And while "a court is ordinarily obligated to afford a special solicitude to *pro se* litigants," such as by liberally construing their pleadings, "a lawyer representing himself ordinarily receives no such solicitude at all." *Tracy* v. *Freshwater*, 623 F.3d 90, 101-02 (2d Cir. 2010).

the FAC under Federal Rule of Civil Procedure 12(b)(6), principally on the ground that the article is absolutely privileged under New York law as a fair and true report of a judicial proceeding and, therefore, that Plaintiff's defamation claim is barred as a matter of law. As discussed below, the Court agrees with Defendant and grants its motion.

BACKGROUND[2]

A. **Factual Background**

    1. **The Divorce Action and the Sanctions Decision**

In February 2014, Plaintiff initiated a divorce action, *Zappin* v. *Comfort*, in New York State Supreme Court, New York County (the "Divorce Action"). (FAC ¶ 6). The Divorce Action has an involved history, which is detailed in the FAC; only some of that background is relevant, however, to the instant defamation action against Defendant.

Several months into the Divorce Action, the case was reassigned to Justice Cooper. (FAC ¶¶ 8-9).[3] Proceedings before Justice Cooper ultimately

---

[2]    This Opinion draws on facts from the Amended Complaint (the "FAC" (Dkt. #23)), the well-pleaded allegations of which are taken as true for purposes of this motion. *See Morrison* v. *Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008); *see also Ashcroft* v. *Iqbal*, 556 U.S. 662, 679 (2009). The Opinion also draws on three additional sources: (i) Defendant's November 10, 2015 article, attached as Exhibit 5 to the FAC (the "Article" (Dkt. #23-5)); (ii) the transcript of the November 10, 2015 evidentiary hearing before Justice Cooper, attached as Exhibit 6 to the FAC ("Hearing Tr." (Dkt. #23-6)); and (iii) Justice Cooper's September 18, 2015 decision sanctioning Plaintiff, attached as Exhibit B to the Affidavit of Barbara Ross ("Ross Aff.") in support of Defendant's motion to dismiss (the "Sanctions Decision" (Dkt. #26-2)). The Court's ability to consider these materials at this stage in the litigation is analyzed in the Discussion section *infra*. Moreover, for convenience, Defendant's moving brief is referred to as "Def. Br." (Dkt. #25); Plaintiff's opposition brief as "Pl. Opp." (Dkt. #30); and Defendant's reply brief as "Def. Reply" (Dkt. #31).

[3]    Plaintiff criticizes the reassignment as "unlawful" and "retaliat[ory]" (*see* FAC ¶¶ 6-9), but the merits of that decision are not before this Court.

2

resulted in a September 18, 2015 decision sanctioning Plaintiff (the "Sanctions Decision"). (*Id.* at ¶ 11). In that decision, Justice Cooper imposed sanctions on Plaintiff in the amount of $10,000 after finding, *inter alia*, that Plaintiff had "done everything in his power to undermine the legal process and use his law license as a tool to threaten, bully, and intimidate," behavior that "call[ed] into question his fitness to practice law." (Sanctions Decision 3). Justice Cooper likewise found that Plaintiff's "tactics, and the language he employ[ed] in his motion papers, ha[d] grown [ever more] extreme and out of step with what is appropriate and permissible advocacy by an attorney, even one who is representing himself." (*Id.* at 7; *see id.* at 8 (describing behavior as a "maelstrom of misconduct")). The Sanctions Decision also criticized Plaintiff's conduct towards other judges and opposing counsel. (*Id.* at 4, 8-9).[4] Plaintiff alleges that Justice Cooper disseminated the Sanctions Decision to "several news outlets, including … a reporter at [Defendant] Daily News." (FAC ¶ 11).[5]

### 2. The November 6, 2015 Incident

About two months later, on November 6, 2015, Justice Cooper held a pre-trial conference during which the parties and attorneys reviewed certain documents. (FAC ¶ 13). At one point while the court went off-the-record,

---

[4]     Plaintiff contends that the Sanctions Decision is statutorily sealed. The Court takes judicial notice that the Sanctions Decision is publically available on Westlaw and has been affirmed by the First Department. *See Zappin* v. *Comfort*, 26 N.Y.S.3d 217 (Table), 2015 WL 5511519, at *1 (N.Y. Sup. Ct. Sept. 18, 2015), *aff'd*, 49 N.Y.S.3d 6 (1st Dep't 2017).

[5]     Again, Plaintiff levies a number of criticisms against the Sanctions Decision (*see, e.g.,* FAC ¶¶ 11-12), including that the decision "contained numerous false and defamatory statements" (*id.* at ¶ 11), but the instant action is not the appropriate venue for such challenges. Likewise Plaintiff's broader criticisms of Justice Cooper's judicial conduct are not germane to the Court's resolution of the instant motion.

3

Plaintiff attempted to pick up and review a folder of documents that had been placed on counsel's table for the parties' review; Plaintiff claims that Paul Kurland, the court-appointed counsel for Plaintiff's child, "grabbed the folder out of Plaintiff's hands and shoved Plaintiff away from the folder." (*Id.* at ¶ 14). This aggravated Plaintiff's back, on which he had had minor surgery the day before, and as a result, "Plaintiff suffered extreme pain." (*Id.*). "Justice Cooper was not present during th[is] incident," but "was apparently alerted to it by court personnel in the courtroom," and "directed counsel to come back during staggered periods of time to review the … documents individually." (*Id.* at ¶ 15).

### 3. The November 10, 2015 Hearing

On November 10, 2015, Justice Cooper held an evidentiary hearing concerning the November 6 incident (the "November 10 Hearing").[6] A copy of the hearing transcript is attached as Exhibit 6 to the FAC. (Dkt. #23-6).

Justice Cooper began the hearing by saying that he needed to "deal with a troubling incident that occurred in this courtroom" on November 6. (Hearing Tr. 4:4-7). He had been informed on that date by a court officer that as counsel for the parties reviewed various documents together, "[Plaintiff] ended

---

[6]    Plaintiff labels the November 10, 2015 hearing "Justice Cooper's Drumhead Evidentiary Hearing" (FAC ¶ 16), and criticizes Justice Cooper's decision to hold the evidentiary hearing in the manner that he did because "Justice Cooper provided no notice that other issues [besides pre-trial motions] would be addressed" at the proceeding (*id.*). Plaintiff alleges that "[n]o doubt, Justice Cooper viewed the November 10, 2015 hearing as a so-called 'great occasion' to garner media coverage to his cases and to further publicly defame and discredit Plaintiff," and had informed the media ahead of time about the hearing. (*Id.* at ¶¶ 16-18). Once again, the Court will not engage with Plaintiff's allegations about the merits of how Justice Cooper conducted the evidentiary hearing.

up on the courtroom floor claiming that he had been assaulted by attorney Kurland." (*Id.* at 5:11-15). Justice Cooper considered it his duty "to find out what indeed occurred" and said that he would "be calling the three court [employee] witnesses to the stand to tell [him] what they saw and heard. All sides [would] have an opportunity to cross-examine the witnesses that they so desire. Both [Plaintiff] and Mr. Kurland [would be permitted] also to take the stand if they so desire[d]." (*Id.* at 7:3-8).

One witness was court officer Donlan. He testified that he "witnessed Plaintiff jumping on the floor … and then [Plaintiff] started yelling to one of the other attorneys [that Plaintiff was] going to sue him for elbowing him." (Hearing Tr. 8:10-16). Donlan added that "at no time did I see anybody throw an elbow. … [It's] possible they b[r]ushed but there was no way there was an elbow ever thrown." (*Id.* at 8:23-9:2). Plaintiff cross-examined Donlan, who reiterated that he did not "think there was even a brush," but that he was "very certain" there was no elbow thrown. (*Id.* at 11:23-12:5).

Another witness was court reporter Glass. She testified that she saw Plaintiff "go up in the air a little bit and over to the left and fell on the floor. … It seemed like he lifted himself up in the air and he hurled himself to the left of the desk." (Hearing Tr. 15:6-15). Glass further testified that Plaintiff then said, "[O]fficer, officer, that man assaulted me. Arrest him." (*Id.* at 15:17-18). She added that she "saw no contact" between Plaintiff and Kurland. (*Id.* at 15:25). Plaintiff cross-examined Glass, who confirmed that she "didn't see [Kurland] do anything like this or push or shove." (*Id.* at 18:18-19).

The third witness was court clerk Williams. She testified that she saw Plaintiff "grasping his chest as he came around to the front of the table blaring out the words he stabbed me. ... He fell to the ground. I would say throw himself on the ground because that's what it appeared, but anyway, he's yelling he stabbed me with his elbow." (Hearing Tr. 21:23-22:4). Williams added that "Mr. Kurland was if not more than two feet away but apart enough that nothing and no one made any contact," and that she did not see Kurland touch Plaintiff in any way. (*Id.* at 22:13-16). Plaintiff cross-examined Williams, who, *inter alia*, reiterated that Plaintiff and Kurland "never made contact." (*Id.* at 23:23). Williams was also cross-examined by counsel for Plaintiff's ex-wife and testified that while Plaintiff was on the floor he stated that he "wanted [Kurland] arrested" and that "[w]hen he got up he pointed directly at him [and said] that he was going to sue him." (*Id.* at 26:15-17).

After the testimony of these three witnesses, Plaintiff attempted to call his own attorney to testify, but Justice Cooper did not permit it, stating that he would "not call[] any of the other attorneys. That will disqualify them." (Hearing Tr. 27:19-28:8). Plaintiff then took the stand and gave his version of events, testifying that Kurland had "grabbed [the documents] out of my hands and shoved me and his elbow made contact with my rib in my back ... where my back was sort of tender from having a procedure the night before[.]" (*Id.* at 30:13-16). Plaintiff continued:

> [A]s soon as he grabbed the documents and elbowed me
> I said he's assaulting me and then I fell to the ground
> because my back was in so much pain and I said he

6

> assaulted me, he assaulted me[,] and then when I got
> up I asked the court officer to intervene and arrest him.

(*Id.* at 31:20-24).

Plaintiff expressly denied ever having accused Kurland of "stabbing" him, though, as Defendant notes, Plaintiff was not asked specifically if he had ever accused Kurland of stabbing him with an elbow. (Hearing Tr. 31:25-32:5; *see* Def. Br. 6). Plaintiff reiterated that Kurland had "ripped [the papers] out of my hands and shoved me." (*Id.* at 32:11-12). Justice Cooper then asked Kurland if he would like to testify, but Kurland and his co-counsel said it would not be necessary. (*Id.* at 42:13-17). It does not appear based on the transcript that Plaintiff ever attempted to question Kurland.

Following the completion of testimony, Justice Cooper made the following findings:

> [I]n a case that is already bizarre, this gets more bizarre ... according to [Plaintiff's] testimony ... somehow Mr. Kurland a 69 year old attorney brutally assaulted [Plaintiff], caused him to fall to the ground as a result of contact that [Plaintiff] says was sufficient to make him fall to the ground.
>
> The credible testimony of three non-interested witnesses court employees is that there was no contact. If there was it was the most minimal contact possible, and the fact that [Plaintiff] would rise and then be shouting things to the extent [of] arrest this man for assault, that he would be saying I'm going to sue you ... the idea this would happen is mind-boggling.
>
> [Plaintiff's] behavior, at the very least, in this incident is bizarre and reflective of a person whose actions are out of control. At worst, it borders on totally improper, perhaps criminal. His actions disrupted the work of this Court[.]

* * *

> This fanciful, I don't think there is any other word for it,
> conspiracy theory by [Plaintiff] … calls to question the
> Plaintiff's ability to tell the difference between true and
> false, fact and fiction, appropriate and inappropriate.
> Those are my findings.

(Hearing Tr. 42:18-44:9).

At the conclusion of the proceeding, Plaintiff engaged in a contentious exchange with Justice Cooper, in which Plaintiff accused the judge of "making false statements" regarding a prior ruling, and said to Justice Cooper, "You destroyed my career.  You did it intentionally.  You published your [Sanctions] [D]ecision to destroy me."  (Hearing Tr. 50:10-26).  Justice Cooper responded that "if anybody destroyed your career, sir, it was you and you alone[.]"  (*Id.* at 51:2-5).  It appears at this point that Justice Cooper had concerns about Plaintiff's conduct in the courtroom and that a court officer moved to restrain Plaintiff:

> [Justice Cooper]: [Y]ou can't control yourself, can you.
>
> [Plaintiff]: You made —
>
> [Justice Cooper]: You cannot control yourself, can you.
>
> [Plaintiff]: I'm controlling myself.
>
> [Justice Cooper]: You are not controlling —
>
> [Plaintiff]: The court officer doesn't have to restrain me.  I'm sitting here.
>
> [Justice Cooper]: I told you to stop.

(*Id.* at 51:6-13).

### 4.     Defendant's November 10, 2015 Article

That same evening, Defendant published a short article about the November 10 Hearing entitled, "Lawyer fined $10,000 for misusing legal license 'feigned an assault' in courtroom, judge says." (FAC, Ex. 5 (the "Article")).[7] Excluding the caption of an accompanying photograph of a gavel, the entire Article consists of seven sentences:

> A Manhattan judge who had fined a lawyer $10,000 for misusing his legal license during a divorce and custody proceeding said Tuesday that the case had gotten even more "bizarre" after the attorney "feigned an assault" in his courtroom.
>
> [Plaintiff] Anthony Zappin, 30, testified that Paul Kurland, 69, had "stabbed" him in the ribs with his elbow as the two wrestled over potential court exhibits — leaving Zappin sprawled on the floor in the courtroom of Manhattan matrimonial judge Matthew Cooper.
>
> However, three court employees standing a few feet away — senior clerk Charlotte Williams, court officer Michael Donlon and court reporter Jackie Glass — testified that they saw no assault.
>
> "In a case that is already bizarre, this gets more bizarre," Cooper told Zappin.
>
> Zappin — jabbing his finger in the air and shouting — told Cooper he was "making false statements[.]  You destroyed my career and you did it intentionally."

---

[7]     The parties each submit a copy of the Article. (*See* FAC, Ex. 5; Ross Aff., Ex. 1).  Each copy has the identical content and accompanying photograph, and identifies the same author and time and date of publication. (*Compare* FAC, Ex. 5, *with* Ross Aff., Ex. 1). However, Plaintiff's submitted copy is entitled "Lawyer fined $10,000 for misusing legal license 'feigned an assault' in courtroom, judge says" (FAC, Ex. 5), while Defendant's submitted copy bears the truncated title "Lawyer feigned assault in courtroom, judge says" (Ross Aff., Ex. 1).  The Court relies upon the copy attached to the FAC, but finds no material difference in the two versions.

Zappin was referring to Cooper's 15-page ruling in which the judge fined him and accused him of misusing his legal license to attack judges, opposing attorneys and court experts.

"If anybody destroyed your career, sir, it's you and you alone," Cooper responded.

(Article).

### 5. The FAC's Allegations

The FAC includes many factual allegations that go well beyond the scope of Plaintiff's defamation action against Defendant. These seemingly extraneous allegations, the Court understands, have been included to provide context for Plaintiff's claims, as well as to substantiate Plaintiff's overarching argument that much of the conduct of which he complains in the three lawsuits was orchestrated in the first instance by Justice Cooper.[8]

The pleading begins with a description of alleged misconduct by a prior presiding judge in the Divorce Action (FAC ¶¶ 6-7); the "unlawful assignment" of the Divorce Action to Justice Cooper (*id.* at ¶ 8); and Justice Cooper's alleged retaliatory, extrajudicial conduct, which Plaintiff labels "an all-out war to publicly discredit, humiliate and destroy Plaintiff's reputation, credibility, and livelihood" (*id.* at ¶ 9). Justice Cooper's misconduct is alleged to include "publishing and disseminating a statutorily sealed decision in [the Divorce Action]," i.e., the Sanctions Decision. (*Id.* at ¶ 11). The FAC further alleges that Justice Cooper sent the Sanctions Decision to several news outlets,

---

[8] The action is grounded in the Court's diversity jurisdiction: Plaintiff is a West Virginia citizen and Defendant is a Delaware corporation based in New York. (FAC ¶¶ 4-5; *see also id.* at ¶ 2).

including Defendant, "who published stories both in the print and online versions of The Daily News echoing Justice Cooper's false and defamatory statements about Plaintiff[.]  Plaintiff ... was irreparabl[y] harmed as a result of the Sanctions Decision and Defendant's publicizing of it."  (*Id.*).

Plaintiff alleges that Defendant's November 10, 2015 Article about the hearing of the same day "contain[s] false statements concerning Plaintiff and did not provide a true or accurate report of the impromptu November 10, 2015 hearing in [the Divorce Action]."  (FAC ¶ 23).  The FAC challenges several specific statements in the Article as false and defamatory and alleges that other omissions likewise disqualify the Article as a "fair and accurate" report of the hearing.  (*Id.* at ¶ 31).  Accordingly, the FAC asserts one cause of action — defamation — against Defendant.  (*Id.* at ¶¶ 34-40).

**B.    Procedural Background**

Plaintiff filed the Complaint on November 14, 2016 (Dkt. #1, 5), and the FAC on January 23, 2017 (Dkt. #23).  Defendant filed its motion to dismiss, and supporting brief and affidavit, on February 22, 2017.  (Dkt. #24-26). Plaintiff filed his opposition brief on April 24, 2017 (Dkt. #30), and Defendant filed its reply brief on May 15, 2017 (Dkt. #31).

## DISCUSSION

**A.    Motions to Dismiss Under Rule 12(b)(6)**

When considering a motion to dismiss under Rule 12(b)(6), a court should "draw all reasonable inferences in [the plaintiff's] favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly

give rise to an entitlement to relief." *Faber* v. *Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks omitted) (quoting *Selevan* v. *N.Y. Thruway Auth.*, 584 F.3d 82, 88 (2d Cir. 2009)). Thus, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007)).

"While *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge [a plaintiff's] claims across the line from conceivable to plausible.'" *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (per curiam) (quoting *Twombly*, 550 U.S. at 570). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557). Moreover, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

"In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco* v. *MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010). "Even where a document is not incorporated by

reference, the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect,' which renders the document 'integral' to the complaint." *Chambers* v. *Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (quoting *Int'l Audiotext Network, Inc.* v. *Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995) (per curiam)).

Here, the FAC attaches several documents as exhibits, the most relevant of which include the Article, attached as Exhibit 5 (Dkt. #23-5), and the transcript of the November 10 Hearing, attached as Exhibit 6 (Dkt. #23-6). These documents are properly considered by the Court at this stage. *See Goel* v. *Bunge, Ltd.*, 820 F.3d 554, 558-59 (2d Cir. 2016) (including exhibits attached to the complaint as among the documents that may properly be considered in resolving a motion to dismiss). The Court likewise properly considers Justice Cooper's September 18, 2015 Sanctions Decision, a copy of which is attached as Exhibit B to the Ross Affidavit (Dkt. #26-2), because the FAC "relies heavily upon" the Sanctions Decision (*see, e.g.*, FAC ¶¶ 11, 25, 28), rendering it "integral" to the FAC. *See Goel*, 820 F.3d at 559.[9]

---

[9]     The Court alternatively takes judicial notice of the Sanctions Decision at this stage because the Court is entitled to "take judicial notice of a document filed in another court not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings." *Glob. Network Commc'ns, Inc.* v. *City of N.Y.*, 458 F.3d 150, 157 (2d Cir. 2006) (quoting *Int'l Star Class Yacht Racing Ass'n* v. *Tommy Hilfiger U.S.A., Inc.*, 146 F.3d 66, 70 (2d Cir. 1998)). Here, where the § 74 privilege is at issue, the Court can and does consider "the allegations and statements in [relevant] court records in order to determine whether the Article provides a 'fair and true' report of those allegations and statements, but will not consider the documents to be evidence of any of the facts stated therein." *Biro* v. *Conde Nast*, 883 F. Supp. 2d 441, 478 (S.D.N.Y. 2012) (taking judicial notice of records in other lawsuits to help determine whether an article's statements were a "fair and true report" of those cases); *see also Fuji Photo Film U.S.A., Inc.* v. *McNulty*, 669 F. Supp. 2d 405, 414-15 & n.52 (S.D.N.Y. 2009) (taking judicial notice of complaint filed in related action in order

**B.    The Fair and True Report Privilege Bars This Defamation Action**

**1.    Applicable Law**

"Defamation is the injury to one's reputation either by written expression, which is libel, or by oral expression, which is slander." *Idema* v. *Wager*, 120 F. Supp. 2d 361, 365 (S.D.N.Y. 2000). Under New York law, "[t]o prove a claim for defamation, a plaintiff must show: [i] a false statement that is [ii] published to a third party [iii] without privilege or authorization, and that [iv] causes harm, unless the statement is one of the types of publications actionable regardless of harm." *Tannerite Sports, LLC* v. *NBCUniversal News Grp.*, — F.3d —, No. 15-3485-cv, 2017 WL 3137462, at *5 (2d Cir. July 25, 2017) (internal quotation marks omitted) (quoting *Stepanov* v. *Dow Jones & Co.*, 987 N.Y.S.2d 37, 41 (1st Dep't 2014)); *see also Celle* v. *Filipino Reporter Enters. Inc.*, 209 F.3d 163, 176 (2d Cir. 2000) (discussion of libel law).

"A statement is not defamatory if it is privileged or authorized." *Abkco Music, Inc.* v. *William Sagan, Norton LLC*, No. 15 Civ. 4025 (ER), 2016 WL 2642224, at *3 (S.D.N.Y. May 6, 2016) (citing *Fuji Photo Film U.S.A., Inc.* v. *McNulty*, 669 F. Supp. 2d 405, 411 (S.D.N.Y. 2009)). Here, Defendant contends that the privilege outlined in § 74 of the New York Civil Rights Law bars this action. Section 74 provides in relevant part:

> A civil action cannot be maintained against any person,
> firm or corporation, for the publication of a fair and true
> report of any judicial proceeding, legislative proceeding
> or other official proceeding, or for any heading of the

---

to determine whether the allegedly defamatory statement was substantially truthful in summarizing the allegations of the complaint).

report which is a fair and true headnote of the
statement published.

N.Y. Civ. Rights Law § 74.

"The purpose of Civil Rights Law § 74 'is the protection of reports of
judicial proceedings which are made in the public interest.'" *Cholowsky* v.
*Civiletti*, 887 N.Y.S.2d 592, 595 (2d Dep't 2009) (quoting *Williams* v. *Williams*,
23 N.Y.2d 592, 599 (1969)). Section 74's "fair and true report" privilege is an
"absolute privilege" that is "not defeated by the presence of malice or bad faith."
*Biro* v. *Conde Nast*, 883 F. Supp. 2d 441, 477 (S.D.N.Y. 2012) (internal
quotation marks and citations omitted).

"A publication is deemed 'fair and true' if it is 'substantially accurate,'"
and it is considered "'substantially accurate' if, despite minor inaccuracies, it
does not produce a different effect on a reader than would a report containing
the precise truth." *Karedes* v. *Ackerley Grp., Inc.*, 423 F.3d 107, 119 (2d Cir.
2005) (internal quotation marks and citations omitted). Inversely, § 74 "does
not afford protection if the specific statements at issue, considered in their
context, 'suggest[ ] more serious conduct than that actually suggested in the
official proceeding.'" *Id.* (quoting *Calvin Klein Trademark Tr.* v. *Wachner*, 129 F.
Supp. 2d 248, 253 (S.D.N.Y. 2001) (quoting *Daniel Goldreyer, Ltd.* v. *Van de
Wetering*, 630 N.Y.S.2d 18, 22 (1st Dep't 1995))). Still, the New York Court of
Appeals has observed that "[a] fair and true report admits of some liberality;
the exact words of every proceeding need not be given if the substance be
substantially stated." *Holy Spirit Ass'n* v. *N.Y. Times Co.*, 49 N.Y.2d 63, 67
(1979) (quoting *Briarcliff Lodge Hotel* v. *Citizen-Sentinel Publ.*, 260 N.Y. 106, 118

15

(1932)).  Indeed, "[t]he report is not required to use the same words as the pleadings to convey the substance of the judicial proceeding and 'the challenged language ... should not be dissected and analyzed with a lexicographer's precision.'"  *Abkco Music*, 2016 WL 2642224, at *3 (internal quotation marks and citations omitted).

Moreover, § 74's absolute privilege "extends to the release of background material with regard to the case, so long as the statement is a substantially accurate description of the allegation, including where the description of the case is offered by a party's legal counsel."  *Lan Sang* v. *Ming Hai*, 951 F. Supp. 2d 504, 521 (S.D.N.Y. 2013) (internal quotation marks omitted) (quoting *Fishof* v. *Abady*, 720 N.Y.S.2d 505, 506 (1st Dep't 2001)).  "Indeed, New York courts have held that 'once it is established that the publication is reporting on a judicial proceeding, how a reporter gathers his information concerning a judicial proceeding is immaterial provided his [or her] story is a fair and substantially accurate portrayal of the events in question.'"  *Biro*, 883 F. Supp. 2d at 478 (quoting *Cholowsky*, 887 N.Y.S.2d at 596); *see also id.* ("[T]he fact that a defendant derive[s] information about the judicial proceedings from secondary sources [does] not mean that Civil Rights Law § 74 [is] inapplicable." (internal quotation marks omitted)); *cf. Lacher* v. *Engel*, 817 N.Y.S.2d 37, 43 (1st Dep't 2006) ("Comments that essentially summarize or restate the

allegations of a pleading filed in an action are the type of statements that fall within [§] 74's privilege." (citation omitted).[10]

## 2. The Fair and True Report Privilege Applies to Defendant's Article About the November 10, 2015 Public Proceeding

A threshold dispute between the parties is whether the § 74 privilege applies to reports of public judicial proceedings in matrimonial actions. This question, in turn, hinges on the proper interpretation of a 1970 decision of the New York Court of Appeals in *Shiles* v. *News Syndicate Co.*, 27 N.Y.2d 9 (1970). Plaintiff argues that *Shiles* renders the § 74 privilege categorically inapplicable to reports of matrimonial proceedings. (Pl. Opp. 20-22). Quoting *Shiles*, Plaintiff contends that "the New York Court of Appeals specifically held 'that the privilege created by section 74 of the Civil Rights Law does not attach to publication of a report of matrimonial proceedings.'" (*Id.* at 20 (quoting *Shiles*, 27 N.Y.2d at 15)). Defendant counters that *Shiles* intended to carve out from § 74 protection only reports of *sealed records* in matrimonial proceedings. (Def. Br. 13-14). There does not appear to be any dispositive judicial guidance from New York federal or state courts about this precise issue in the nearly half century since *Shiles* was decided. It would seem, at first blush, based on the excerpt quoted by Plaintiff that he is correct. But a closer look at *Shiles* reveals that the quoted language is not indicative of the Court's holding.

---

[10] The parties do not address in their briefs whether, with respect to the § 74 privilege, it is Plaintiff's burden to disprove, or Defendant's burden to prove, the existence of the privilege. The Court concludes that, irrespective of the allocation of burden, the applicability of the privilege has been demonstrated as a matter of law based on the materials the Court can properly consider in resolving this motion.

In *Shiles*, the defendant published three sensationalist articles about the plaintiff's divorce action based on sealed court records that the defendant had obtained from the plaintiff's former spouse. *See Shiles*, 27 N.Y.2d at 12-14. Plaintiff sued, *inter alia*, for libel and challenged the defendant's reliance on the § 74 privilege. *Id.* at 13. The New York Court of Appeals ultimately held that the privilege did not protect the defendant against the plaintiff's defamation claim. *Id.* at 18-19. In reaching this conclusion, the Court examined both the § 74 privilege as well as § 235 of the New York Domestic Relations Law, "which prohibits the taking of copies, or even the inspection, of the records of matrimonial proceedings by any one other than the parties or their counsel." *Id.* at 14. The Court previewed its holding at the outset:

> Notwithstanding its broad language, we do not believe that [§] 74 of the Civil Rights Law was ever intended to defeat th[e] design [of § 235] by extending to persons who, despite [§] 235, were able to obtain such records, the right to publish and disseminate their contents without regard for their truth or falsity or for the harm they may cause to the reputations of the individuals involved.

*Id.*

The Court's analysis began by recognizing the difficulty of balancing press freedoms and personal privacy in the matrimonial context. It highlighted § 74's animating principle — "the public interest in having proceedings of courts of justice public, not secret, for the greater security thus given for the proper administration of justice." *Shiles*, 27 N.Y.2d at 14 (internal quotation marks and citations omitted). It then noted that, in most instances, "the advantage in having judicial proceedings made public more than

counterbalances the inconveniencies to the private persons whose conduct may be the subject of such proceedings." *Id.* (internal citations and quotation marks omitted). However, the Court observed, the New York legislature through § 235 "made it plain that in matrimonial actions the balance of convenience is in favor of the individual and that in the case of papers filed in such actions the public interest is served not by publicizing them but by sealing them and prohibiting their examination by the public." *Id.*

The *Shiles* Court found support for this interpretation in a series of cases, which the Court described as reflecting

> a recognition of the inherently personal nature of matrimonial proceedings and the obvious desirability that records of such proceedings not be used to gratify private spite or promote public scandal; and, certainly, not to permit one spouse to force the other into a desired settlement by threatening disclosure and publication of the charges and accusations contained in the pleadings or affidavits filed in the matrimonial action.

*Shiles*, 27 N.Y.2d at 15 (internal quotation marks and citations omitted).

Later, in examining the relevant legislative history, the New York Court of Appeals also favorably block-quoted a lower court explication of the incongruity of applying the § 74 privilege to sealed matrimonial records:

> As the Appellate Division so well put it in *Stevenson* [v.] *News Syndicate Co.*, "[I]t is illogical to hold that the defendant had the right to publish to its millions of readers information which not one of those readers could personally obtain. In situations where the public have the right of access to proceedings in open court, or the right to inspection of filed papers, the effect of a newspaper publication is that defendant's reporter is the agent of the public to report to them what they could hear or see if they so desired. But when the public have no right to see the papers filed in a matrimonial action,

> a newspaper should not have the right to spread the
> allegedly false contents of those papers to the public."

*Shiles*, 27 N.Y.2d at 17-18 (quoting *Stevenson* v. *News Syndicate Co.*, 96

N.Y.S.2d 751, 754-55 (2d Dep't 1950)) (alterations added).

It is clear that despite the *Shiles* Court's occasional reference to the

inapplicability of § 74 to "the publication of a report of matrimonial

proceedings,"[11] a more nuanced inspection of the decision's facts, analysis, and

foundational authorities confirms that *Shiles* does not render the § 74 privilege

categorically inapplicable to public judicial proceedings in a matrimonial

action. This interpretation is further confirmed by the Court's own description

of *Shiles*, fifteen years later in *Freihofer* v. *Hearst Corp.*, as standing for the

proposition "that one who had published and disseminated the contents of the

records of matrimonial proceedings could not rely upon a defense of statutory

---

[11]   One explanation for the breadth of these statements is *Shiles*'s underlying premise that the matrimonial action was not open to the public.  *See Shiles* v. *News Syndicate Co.*, 27 N.Y.2d 9, 14 (1970) ("Since, then, such matrimonial actions were and are not proceedings which the public had the right to hear or see, it follows — and it has been consistently held — that the privilege generally accorded to reports of judicial proceedings is unavailable to reports of matrimonial actions.").

Section 235 of the Domestic Relations Law *requires* that matrimonial records remain sealed except pursuant to court order, but *allows* matrimonial proceedings to remain open to the public unless closed by the court.  *Compare* N.Y. Dom. Rel. Law § 235(1) ("An officer of the court ..., or his clerk, either before or after the termination of the suit, *shall not* permit a copy of any of the pleadings, affidavits, findings of fact, conclusions of law, judgment of dissolution, [etc.,] to be taken by any other person than a party, or the attorney or counsel of a party, except by order of the court." (emphasis added)), *with id.* § 235(2) ("If the evidence on the trial of such an action or proceeding be such that public interest requires that the examination of the witnesses should not be public, the court or referee *may* exclude all persons from the room except the parties to the action and their counsel[.]" (emphasis added)).

Here, it is undisputed that the November 10 Hearing was open to the public and that the Article was written based on the in-person attendance of Defendant's reporter at the hearing.  (*See* Hearing Tr. 34:22-25; FAC ¶ 20; Ross Aff. ¶¶ 3-4).

privilege that the articles were fair and true reports of judicial proceedings." 65 N.Y.2d 135, 141 (1985) (citing *Shiles*, N.Y.2d at 15).

In short, this Court has no doubt that the § 74 privilege is available to Defendant for its report of the public November 10 Hearing. The Court next examines whether Defendant's invocation of the § 74 privilege successfully bars this action.

### 3. The Article Is a Fair and True Report of the November 10, 2015 Proceeding and Related Judicial Documents

#### a. The Substantial Accuracy of the Report May Properly Be Determined As a Matter of Law

Another threshold question, likewise disputed among the parties, is whether the substantial accuracy of the Article for purposes of the § 74 privilege can be appropriately evaluated at the motion to dismiss stage. The answer is yes. "It is for the Court to determine as a matter of law if a publication is a 'fair and true' report under [§] 74, unless the Court determines that an issue of fact remains." *Abkco Music*, 2016 WL 2642224, at *4 (internal quotation marks omitted) (quoting *Test Masters Educ. Servs., Inc.* v. *NYP Holdings, Inc.*, No. 06 Civ. 11407 (BSJ), 2007 WL 4820968, at *3 (S.D.N.Y. Sept. 18, 2007)).

No issue of fact remains here and, contrary to Plaintiff's conclusory argument (*see* Pl. Opp. 24-25), the "fair and true" nature of the Article is not a question for the jury. As noted, copies of the Article, the November 10 Hearing transcript, and the written Sanctions Decision are all properly before the Court; whether the Article's coverage of the November 10 Hearing and of background

material such as the Sanctions Decision is substantially accurate is a question that here is appropriately resolved as a matter of law. *See Abkco Music*, 2016 WL 2642224, at *4 ("Since the parties do not identify any issues of fact and only contest whether the undisputed content of the press release qualifies as a 'fair and true report' of the undisputed content of the Publishers' Complaint, the Court can resolve the dispute as a matter of law on the instant motion."); *see also Lan Sang,* 951 F. Supp. 2d at 524 (partially granting motion to dismiss after concluding the "fair and true" report privilege applied to one of the allegedly defamatory statements); *Fuji Photo*, 669 F. Supp. 2d at 414-15 (dismissing defamation counterclaim where statement "[did] not imply that [counterclaimant] engaged in any misconduct other than that alleged in the Complaint" in another action).

### b. The Article Is a Substantially Accurate Report of the November 10, 2015 Proceeding and the Sanctions Decision

Plaintiff alleges that the Article contains "false statements concerning Plaintiff and did not provide a true or accurate report of the impromptu November 2015 hearing in *Zappin* v. *Comfort*." (FAC ¶ 23; *see also* Pl. Opp. 22-24). The FAC alleges the following:

> (i)    "The Daily News wrote that Plaintiff 'feigned an assault in courtroom.'" (FAC ¶ 24).

> (ii)    "The Daily News wrote that Plaintiff ['misused] [his] legal license.'" (*Id.* at ¶ 25).

> (iii)    "The Daily News wrote that Plaintiff 'misus[ed] his legal license to attack judges, opposing attorneys and court experts.'" (*Id.* at ¶ 28).

<blockquote>
(iv)    "The Daily News wrote that 'Zappin — jabbing his finger in the air and shouting[.]'" (<em>Id.</em> at ¶ 27).

(v)    "The Daily News wrote that 'Anthony Zappin, 30, testified that Paul Kurland, 69, had 'stabbed' him in the ribs[.]'" (<em>Id.</em> at ¶ 26).
</blockquote>

Plaintiff claims that each of these Article statements is false and defamatory. (<em>Id.</em> at ¶¶ 24-28). Plaintiff also contends that the Article is false and defamatory because "[i]t failed to report that Plaintiff was not provided notice of the impromptu hearing," and "further failed to report that Plaintiff was denied an opportunity to present evidence (as a result of the lack of notice), call witnesses in his defense and cross-examine Mr. Kurland." (<em>Id.</em> at ¶ 31). The Court finds each of these statements, and the Article as a whole, to be substantially accurate and, therefore, protected under the § 74 privilege. Below, the Court examines each statement in turn.

In the first statement, the FAC alleges that "[Defendant] wrote that Plaintiff 'feigned an assault in courtroom.'" (FAC ¶ 24). Plaintiff could be referring to two potential statements in the Article. The first is the title of the Article, "Lawyer fined $10,000 for misusing legal license 'feigned an assault' in courtroom, judge says." (Article 1). The second is the Article's first sentence, which states, "A Manhattan judge … said Tuesday that the case had gotten even more 'bizarre' after the attorney 'feigned an assault' in his courtroom." (<em>Id.</em> at 2). In both instances, the Article identifies the judge as the source of the statement that Plaintiff "feigned an assault" in his courtroom. And, indeed, Justice Cooper repeatedly used this exact description at the November 10 Hearing:

> I did not expect that I would be unable to have the parties sit at the same table because [Plaintiff] would use it as an opportunity to feign an assault.

(Hearing Tr. 46:14-17). And later:

> So, [Plaintiff] would feign an assault, would fabricate an assault why would anyone want to be with him. How could I ask the attorneys to be in the same room [as Plaintiff] when what is going to happen [is] there will be allegations made, attacks made against them that are fabricated. I cannot do that.

(*Id.* at 47:4-8). The Article's statement is a direct quotation of Justice Cooper's description of Plaintiff's conduct and thereby an entirely accurate report of the judge's finding on this point.

The second and third challenged statements suffer the same fate. The FAC alleges, "[Defendant] wrote that Plaintiff ['misused] [his] legal license'" (FAC ¶ 25), and "that Plaintiff 'misus[ed] his legal license to attack judges, opposing attorneys and court experts'" (*id.* at ¶ 28). Again, in its full context, the Article states: "A Manhattan judge … had fined a lawyer $10,000 for misusing his legal license during a divorce and custody proceeding," and "[Plaintiff] was referring to [Justice] Cooper's 15-page ruling in which the judge fined him and accused him of misusing his legal license to attack judges, opposing attorneys and court experts." (Article 2).

These Article statements either directly quote or summarize the Sanctions Decision. In the Sanctions Decision, Justice Cooper found that "[P]laintiff has done everything in his power to undermine the legal process and use his law license as a tool to threaten, bully, and intimidate." (Sanctions Decision 3). Justice Cooper also elaborated upon Plaintiff's inappropriate

24

conduct towards judges (*see id.* at 4-5), opposing counsel (*see id.* at 8-9), and a court-appointed psychiatric expert witness (*see id.* at 12-13), and indeed imposed a $10,000 fine on Plaintiff (*see id.* at 15-16). The Article's description of Justice Cooper's findings and monetary fine is entirely accurate. *See Lan Sang*, 951 F. Supp. 2d at 521 (recognizing that § 74's absolute privilege "extends to the release of background material with regard to the case, so long as the statement is a substantially accurate description"); *cf. Lacher*, 817 N.Y.S.2d at 43 ("Comments that essentially summarize or restate the allegations of a pleading filed in an action are the type of statements that fall within [§] 74's privilege.").

Plaintiff in fact acknowledges that both of these statements are "based off of Justice Cooper's Sanctions Decision" (FAC ¶ 25; *see also id.* at ¶ 28), but believes that Defendant's description of the Sanctions Decision findings is false and defamatory because the findings themselves are "conclusory" and "categorically untrue." (*Id.* at ¶¶ 25, 28). In so doing, Plaintiff conflates the question whether Defendant's coverage offers an accurate report of Justice Cooper's decision with whether the decision itself has merit. The instant defamation case against Defendant and the operation of the § 74 privilege is concerned principally with the former issue, not the latter. *See Biro*, 883 F. Supp. 2d at 479 ("The fact that [the plaintiff] disagrees with the allegations contained in the affidavit does not affect whether the statement is a fair and true report of the allegations it paraphrases. Thus, the Court dismisses the claim for defamation based on this statement."). The Court once again easily

finds that the Article offers an entirely accurate report of Justice Cooper's Sanctions Decision, which served as background material in Defendant's coverage of the November 10 Hearing.

Next, the FAC alleges, "[Defendant] wrote that '[Plaintiff] — jabb[ed] his finger in the air and shout[ed]," but that this statement "is categorically false and defamatory." (FAC ¶ 27). Quoted in context, the Article states that "[Plaintiff] — jabbing his finger in the air and shouting — told [Justice] Cooper he was 'making false statements .... You destroyed my career and you did it intentionally.'" (Article 2). The transcript of the November 10 Hearing makes clear that Plaintiff uttered both of these exact statements to Justice Cooper (Hearing Tr. 50:10, 50:24-25). And while the transcript cannot communicate whether Plaintiff gestured with his finger or raised the volume of his voice during this exchange, the transcript evidences that Plaintiff behaved in a manner that caused Justice Cooper to say that Plaintiff "[could not] control [him]self" (*id.* at 51:7-10), and caused a court officer to move to restrain Plaintiff (*id.* at 51:10-13). Thus, even accepting at this stage Plaintiff's allegations that he did *not* gesture with his finger or raise his voice, the Court finds that the Article's description of this exchange "does not produce a different effect on a reader than would a report containing the precise truth," *Karedes*, 423 F.3d at 119, which is that Plaintiff did utter the quoted statements, that Justice Cooper repeatedly admonished Plaintiff to "control [him]self," and that a court officer moved to restrain Plaintiff (*see* Hearing

Tr. 50:10, 50:24-25, 51:7-13). The Court finds that the Article's report of this portion of the November 10, 2015 Hearing is substantially accurate.

The FAC further alleges, "[Defendant] wrote that '[Plaintiff], 30, testified that Paul Kurland, 69, had 'stabbed' him in the ribs[.]'" (FAC ¶ 26). Once again, the FAC's quoted excerpt presents the quoted phrase out of context. The excerpt, in which the word "stab" stands alone, implies stabbing with an object. The Article makes clear, however, that the testimony was that the alleged stabbing was *with an elbow*. The Article's full sentence states: "[Plaintiff], 30, testified that [Mr.] Kurland, 69, had 'stabbed' him in the ribs *with his elbow as the two wrestled over potential court exhibits* — leaving [Plaintiff] sprawled on the floor in the courtroom of Manhattan matrimonial judge Matthew Cooper." (Article 2 (emphasis added)).

Plaintiff is correct that this statement contains an error. It was not Plaintiff but court clerk Williams, one of the testifying eyewitnesses to the November 6, 2015 incident, who testified that Plaintiff "grasp[ed] his chest as he came around to the front of the table blaring out the words he stabbed me ... yelling he stabbed me with his elbow." (Hearing Tr. 21:23-22:4). Defendant acknowledges this misattribution. (*See* Def. Br. 16). But the standard under § 74 is not whether the Article's statement contains a mistake or an inaccuracy, but whether "*despite* minor inaccuracies, it produce[s] a different effect on a reader than would a report containing the precise truth." *Karedes*, 423 F.3d at 119 (emphasis added). Here, the answer is that it does not.

"Courts have liberally interpreted the 'fair and true report' standard 'so as to provide broad protection to news accounts of judicial or other official proceedings.'" *Akassy* v. *N.Y. Daily News*, No. 14 Civ. 1725 (LTS), 2017 WL 325259, at *3 (S.D.N.Y. Jan. 23, 2017) (quoting *Becher* v. *Troy Pub. Co.*, 589 N.Y.S.2d 644, 646 (3d Dep't 1992)). As noted, the New York Court of Appeals has recognized that "[a] fair and true report admits of some liberality; the exact words of every proceeding need not be given if the substance be substantially stated." *Holy Spirit Ass'n*, 49 N.Y.2d at 67 (internal citation and quotation marks omitted).

The misattribution here does not produce a different effect on a reader than would the precise truth because three eyewitnesses, in addition to Plaintiff himself, testified to the substantive facts relayed in the challenged Article statement. *See Tacopina* v. *O'Keeffe*, 645 F. App'x 7, 8 (2d Cir. 2016) (summary order) (affirming the dismissal of a defamation claim on § 74 grounds where an article "misattributed the source of [certain drug-related] allegations" because "this inaccuracy would not have impacted the effect on readers; it is unlikely that the fact that two former clients, instead of one, alleged that [the plaintiff] abused drugs would have impacted the esteem in which [the plaintiff] was held by the public"). Here, one eyewitness *did* testify that Plaintiff yelled that he had been "stabbed" in the ribs with Kurland's elbow and that Plaintiff *did* fall to the floor as a result. (Hearing Tr. 21:23-22:4). Likewise, two other eyewitness testified that Plaintiff yelled that he would sue Kurland for "elbowing" him (*id.* at 8:10-16), and that Plaintiff had fallen to the

floor (*id.* at 15:6-15).  Indeed, Plaintiff himself testified to these same key facts:

he was elbowed in the ribs and he fell to the floor.  In Plaintiff's words:

> [Kurland] grabbed [the documents] out of my hands and
> shoved me and his elbow made contact with my rib in
> my back and where my back was sort of tender from
> having a procedure the night before it sent — it just put
> me in immense pain.
>
>                     \* \* \*
>
> [A]s soon as he grabbed the documents and elbowed me
> I said he's assaulting me and then I fell to the ground
> because my back was in so much pain[.]

(*Id.* at 30:10-16, 31:20-22).

Whether the inaccuracy in the Article's statement was to attribute the

wrong verb to the right speaker or the right verb to the wrong speaker, the

effect on the audience is the same as the "precise truth":  Multiple witnesses,

Plaintiff included, testified that Plaintiff fell to the ground after he had claimed

that Kurland used his elbow to make contact with Plaintiff's ribs.  The Article's

cross-wired description of this contact as a *stab* of an elbow does not render it

inaccurate.  *See Tacopina*, 645 F. App'x at 8 ("[T]he language used [in an

article] should not be dissected and analyzed with a lexicographer's precision.

This is so because a newspaper article is, by its very nature, a condensed

report of events which must, of necessity, reflect to some degree the subjective

viewpoint of its author." (internal quotation marks omitted) (quoting *Holy Spirit

Ass'n*, 49 N.Y.2d at 68)).

Here the precise truth is sufficiently identical to the Article's description,

"despite [a] minor inaccurac[y]," such that the Court can conclude as a matter

of law that the statement is substantially accurate and a fair and true report of

the November 10 Hearing.  *Karedes*, 423 F.3d at 119; *see also Holy Spirit Ass'n*, 49 N.Y.2d at 69 ("[A] fair report which is not misleading, composed and phrased in good faith under the exigencies of a publication deadline, [should not] be thereafter parsed and dissected on the basis of precise denotative meanings which may literally, although not contextually, be ascribed to the words used.").  Put differently, the Court easily finds that "the statement[] at issue, considered in [its] context," does *not* "'suggest[ ] more serious conduct than that actually suggested in the official proceeding,'" and is thereby entitled to the § 74 privilege.  *Karedes*, 423 F.3d at 119 (citations omitted).

Finally, Plaintiff alleges that the Article was rendered false and defamatory because it "failed to report that Plaintiff was not provided notice of the impromptu hearing [and] that Plaintiff was denied an opportunity to present evidence (as a result of the lack of notice) [or to] call witnesses in his defense and cross-examine Mr. Kurland." (FAC ¶ 31).  Plaintiff's opposition brief lists multiple grievances about the November 10 Hearing, including that "Justice Cooper deni[ed] Plaintiff the ability to call witnesses in his defense," "Plaintiff [was] foreclosed from examining or cross-examining Mr. Kurland," and "Justice Cooper with[eld] and mischaracterize[ed] material evidence in his possession that Plaintiff had given to him at a prior hearing." (Pl. Opp. 22).

This defamatory-by-omission argument, while perhaps appropriate in other contexts, goes nowhere here.  First, many of Plaintiff's grievances are unsupported by the transcript of the hearing; for example, there is no indication that Plaintiff attempted to examine Kurland but was rebuffed by

Justice Cooper.  (*See, e.g.,* Hearing Tr. 42:7-17).  More importantly, Plaintiff identifies no persuasive case law that supports so broad a scope of defamation liability for newspaper coverage of judicial proceedings.  Plaintiff's argument would have newspapers serve a role not unlike courts of appellate review, responsible for identifying every potential procedural and substantive legal error in a judicial proceeding.  Newspapers are neither equipped nor obligated to do such a thing.  *See* N.Y. Civ. Rights Law § 74 (the § 74 privilege demands a "fair and true report of [a] judicial proceeding."); *cf. Cholowsky*, 887 N.Y.S.2d at 596 ("[T]here was no requirement that the publication report the plaintiff's side of the controversy.").

Relatedly, Plaintiff again conflates the merits of Justice Cooper's judicial acts, including the manner in which he conducted the November 10 Hearing, with Defendant's news coverage of those acts.  The core of Plaintiff's omission argument is that Defendant's seven-sentence coverage of the judicial proceeding failed to describe all of the alleged legal errors in that proceeding.  But the alleged omissions are largely unrelated to Defendant's fair and true *reporting* of the hearing; Plaintiff does not allege, for example, that the Article omitted a key factual finding by Justice Cooper that rendered the remainder of the Article misleading or inaccurate.  *Cf. McDonald* v. *E. Hampton Star*, 781 N.Y.S.2d 694, 695 (2d Dep't 2004) ("Although the article failed to report that the federal court's decision granted the plaintiff leave to file an amended complaint, and that he thereafter filed an amended complaint, those omissions did not alter the substantially accurate character of the article."); *Glendora* v.

31

*Gannett Suburban Newspapers*, 608 N.Y.S.2d 239, 240 (2d Dep't 1994)
("Contrary to the plaintiff's contentions, the accuracy of the report was not
altered merely because the article did not contain the plaintiff's 'side of the
Judge's decision.' Similarly, the fact that the article did not report that the
plaintiff appealed from the court's decision does not alter the accuracy of the
newspaper's report on that decision.").

In sum, the Article presents a substantially accurate report of the
November 10 Hearing and its related background materials, such as the
Sanctions Decision. While much of the Article consists of either direct
quotations from the hearing and the decision or summaries thereof, as
discussed above, any minor inaccuracies or alleged omissions do not produce a
different effect on the reader than the precise truth. *See Karedes*, 423 F.3d at
119.[12] The Article qualifies as "the publication of a fair and true report of a[]
judicial proceeding" that is entitled to protection under § 74's privilege and,
consequently, Plaintiff's "civil action [for defamation] cannot be maintained
against" Defendant. N.Y. Civ. Rights Law § 74; *see, e.g.*, *Abkco Music*, 2016 WL

---

[12]     For substantially the same reasons, the FAC fails plausibly to plead that the Article
statements were "substantially false," as required to state a claim for defamation. *See
Tannerite Sports, LLC* v. *NBCUniversal News Grp.*, — F.3d —, No. 15-3485-cv, 2017 WL
3137462, at *3 (2d Cir. July 25, 2017) ("To satisfy the falsity element of a defamation
claim, plaintiff must allege that the complained of statement is 'substantially false.'
Thus, if an allegedly defamatory statement is 'substantially true,' a claim of libel is
legally insufficient and ... should [be] dismissed." (internal quotation marks omitted)
(quoting *Franklin* v. *Daily Holdings, Inc.*, 21 N.Y.S.3d 6, 12 (1st Dep't 2015)); *see id.* ("[A]
statement is substantially true if the statement would not have a different effect on the
mind of the reader from that which the pleaded truth would have produced." (internal
quotation marks and citations omitted)).

2642224, at *3, 6 (dismissing defamation claim because § 74 privilege precluded action).

## CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss is GRANTED. The Clerk of Court is directed to terminate all pending motions, adjourn all remaining dates, and close this case.

SO ORDERED.

Dated:     August 9, 2017
           New York, New York

_____
          KATHERINE POLK FAILLA
          United States District Judge